Janssen Pharmaceuticals, Inc. v. Mylan Laboratories, Mr. Wurlinger. Good morning, Your Honor. May it please the Court. This is an unprecedented case involving an unprecedented patent. The District Court found that Mylan encourages infringement of Janssen's PP3M missed-dose regimen, which requires the patient to miss a dose in order to infringe. Can I ask you a kind of procedural question before we get down to the merits? Please. I get the impression from your briefing that not only the drug at issue here, but also the indicated methods of using it are not patented? That is correct. And that is one of the primary issues we have in this case, that these products use a known drug in a known way for a known purpose. Okay. So I guess if that's the case, then why couldn't you just sell the drug without the specific So is that why we didn't carve it out?  Or why, yeah, out of the label. Yeah. So, you know, there's nothing about that in the record, and I think my candid response to you is we didn't think it was necessary to carve it out because Section 2.3 is not necessary for the indicated usage of the product. You can use the product when the product is used as prescribed, and that includes the warning not to miss doses and to take the product exactly as your doctor tells you to. You're never going to get into Section 2.3. And is it too late to do anything about that if you were to not prevail on this appeal? I do not... I'm just interested in it. I appreciate that, and my candid answer is I don't have an answer. I'm unfortunately an appellate lawyer, not an FDA regulatory lawyer, and it would be very dangerous for me to start speculating about all of that. Well, that's why I'm asking you, because I'm an appellate judge and not an FDA. Sorry. There is true interest in that. You know, maybe we can do a 28-J or something, but that is far beyond my bailiwick. But what I do know, Your Honor, is that there are striking parallels between these cases. The label says if you miss a dosage, follow this protocol, right? It doesn't give you an optional protocol. So when you're talking about Section 2.3 itself, it is in direct language, but I think that if is very important, Judge Dyke, and I think that if is what brings us to HZNP, because as I said, you have to miss a dose in order to infringe. Janssen admits that. Dr. Somi admits that. That's at Appendix page 1992, lines 19 and 21. And if you'll indulge me, I think HZNP is very instructive, and I'd like to walk through the parallels between that case and this one. I am at 940F3rd at 701. This is the court addressing Horizon's specific intent argument. The court said, Horizon maintains that activists' labeling tracks closely with the asserted claims, thereby reflecting activists' specific intent to induce infringement. That's Janssen's argument in this case. That's the red brief pages 12 and 26 through 28. That was the district court's holding, Appendix pages 20 through 25. Continuing the court said, although Horizon recognizes that not every user will need to apply sunscreen, insect repellent, or another topical medication, it contends that when such need arises, activists' instructions will lead to an infringing use. But the difference, and I think, I'm not, maybe I don't remember everything in HZNP, but here, the claim here is already conditional. So you've got the claim that's already conditional. So I think that's somewhat different. Well, the claim is, I guess I'm not entirely following your honors. There's specific limitation that you're thinking is conditional that would distinguish this? Yeah. I mean, the claim says, if this, then this. So the claim is, you know, the claim itself is conditional. Right. I don't know if, I don't recollect if the claim uses the word if, but it does, what it does say is that the patient misses a dose. That is very true. But I don't think that's any different than what you had in HZNP. Because the claim there required the person to apply the topical medication, wait, and then apply a sunscreen or an insect repellent or some other type of medication on top of it. And what this court said in HZNP is that you do not, the claimed method is not mandatory or required for the indicated usage of the product. It's merely permissive. And for that reason, there is no encouragement. You have the same thing here, and in fact, something more. I'm not following this. The label tells you don't miss dosages, but it says if you do miss a dose, follow this protocol.  Correct. It does. And that's really not any different from the label that you had in HZNP. Well, the HZNP label didn't instruct the actual subsequent application of the sunscreen. It just said, it simply advised that if you are so inclined, wait first. Right. So it was different than the instruction that we have in this claim. I mean, I think it's different. Sure. Well, I think it's different in the sense that in HZNP, it was permissive. There was indifference as to whether or not you went on to the claimed method, whereas here, there's outright discouragement. Don't do it. But when you actually get into the instructions that you had in HZNP, wait until the area is completely dry before covering with sunscreen, applying insect repellent, or covering. The notion of waiting to apply that medication, that's not an if. It's if in the sense, if you're going to do it, follow this. Instead, it was an if-then instruction that is on page 702 of the court's opinion. And another extremely important aspect that the court pointed out in HZNP is substantial non-infringing uses. And here, if Mylan's products are used as they are instructed, you don't just have substantial non-infringing uses. You have complete non-infringing uses. And I think another notable aspect of this regimen is that in order to practice Claim 5, you actually have to have non-infringing use in the first instance. The patient has to be on the indicated PP3M therapy and then stop before you can even have infringement. So if I may, I'd like to briefly touch on inevitability and divided infringement before spending some time on obviousness, because I think there's some issues to talk about there. On inevitability, I really do just have three very... Can I ask you just about the use of the word inevitability? It was a little puzzling. Everybody used it, including the district court judge. But why are we so concerned about having to prove that the direct infringement was inevitable? I thought the standard was preponderance, more likely than not. So what in our case law requires inevitability? So inevitability was the theory that Janssen put forward in order to prove its burden. And I think the reason we spoke of inevitability is because this is an Atch-Waxman case. We're talking about a hypothetical infringement, and what they were trying to show is that based upon the label, if you were to put this drug on the market, it would inevitably lead to infringement. And I believe that is the language that the court used in Takeda and Vanda, which is where I think this is coming from. And my very brief points to you on this are that inevitable non-adherence, which was the main point that Janssen relied upon, does not amount to inevitable infringement, because the patient still has to come back, they still have to come back within the window, and the provider still has to keep them on PP3M, and they still have to show up for all three dosages. Unless all of that happens, you don't have infringement. And Janssen has conceived that point. In the interest of time, I am actually going to rest on my briefs on divided infringement unless any of you have specific questions on that issue. Well, do you want to go to Dr. Kohler's testimony and your assertion about him with regard to infringement?  I can briefly touch on it. I do think it's very well laid out in the briefs. But our point is that everybody agreed that Dr. Kohler's testimony was going to be limited to secondary consideration. No, it is well laid out in your brief. I appreciate that. I don't need, so I don't need the background. Sure. What I want to know is why the district court in her, the district court's got a footnote in a very thorough opinion in which she says she recognizes there's an issue with that and she says there's other testimony as well and she relies on the other testimony as well. So why isn't that effectively harmless error? Because the other testimony comes from Dr. Somi and Dr. Berger and neither of them get Janssen to where they need to be in terms of showing inevitable completion of the practice if this were to be put on the market. Well, your own expert testified that he supervised utilization of the protocol, right? Very important point here. He supervised an attempt of it. It failed. And the problem is you can't get a non-adherent patient to show back up for all three shots. The district court thought that attempting infringement was tantamount to infringement and that's legal error. You have to practice all limitations or in this case, you have to show that all limitations would inevitably be practiced if this were to be put on the market. Did he testify that the protocol was not followed when he supervised it? Could you show me where he said that? He said that at Appendix Page 2160 and I believe this is lines 21 through 25, I believe his testimony was. 2160, yes, he testified and even the district court recognized this point. She said, I'm not buying it. I still think the attempt is enough, but the district court recognized that that was his testimony. 2160, where does he say that? What I have here on my outline is that it is on lines 21 through 25, Your Honor. And I regret I do not have that one in front of me, so I can't tell you precisely what it says as I stand here. It says they tried, but they were unsuccessful. Correct. They didn't complete it because the patient wouldn't show up for all the shots. How would the logistics go if we, could we consider excluding the testimony of Dr. Kohler? And if we did, how would that affect the case? Sure. Well, I think our position is that the testimony of Dr. Somi and Dr. Berger is inadequate as a matter of law to satisfy the requirement of showing direct infringement by third actor. So in that sense, you could just reverse. I don't even think you need to vacate. But if there were some concern about doing that in the first instance, I think vacature would also be appropriate. Do we have the discretion to disregard, say, we're just going to disregard the testimony because the trial court erred in looking at it? I think you absolutely did, yes. So I am starting to get into my rebuttal time, but I do want to touch obviousness. And if I need to sacrifice some of my rebuttal time to do that, I will. Our point to you here is that the district court committed the exact same methodological errors that this court recently rejected in Jansen v. Teva, which involved Jansen's PP1M product and a number of the same lawyers that you have before you here today. And I want to highlight three of the specific errors that the court committed that line up with Jansen v. Teva. And I'm looking specifically at pages, or I'm paraphrasing, 97F4 at 928. The first is that the district court tackled the prior art one by one, based upon differences in the individual references and claims, not considering the art as a whole. And this tainted the court's consideration of the PP1M art as it was applied to the PP3M art. You can see this specifically at appendix pages 43, 45, 52, and 60. Second major error is that the court failed to consider the perspective of the skilled artisan capable of deducing what references suggest or applying ordinary creativity. The district court reduced this down to an invocation of common sense, which it proceeded to reject. That is on appendix pages 43 through 44. And it discounted references, specifically the JAMA reference, due to the absence of safety or pharmacokinetic data, despite the fact that claim five is not limited by any such data. And you can see this at appendix pages 46, 50, and 59. These were not harmless errors. They impacted multiple issues, which we believe would have gone our way under the correct KSR rubric. This specifically goes to the structure of the PP3M misdose regimen, which is taught in the Sistina label. Again, the court pushed aside the art based upon the fact that the PP1M art did not involve PP3M. There's also the issue of using PP1M loading doses. That is taught in the JAMA reference to use PP1M before initiating PP3M maintenance therapy. This was disregarded due to the errors related to pharmacokinetic data. Resuming maintenance therapy without first stabilizing. Again, that is in PP1M. And then very briefly, the four- to nine-month window, we have an issue here where we had made a range argument where we never even got a decision. Jansen admits that. They suggest that you can just deal with that as a matter of law. We've laid out in our briefs why you can't. We think on this issue alone, vacature is required. Unless there are any further questions, I will reserve the remainder of my time for rebuttal. We'll give you two minutes. Okay. I appreciate that, Judge. Thank you, Mr. Fisher. Good morning, Your Honors. May it please the Court, Aaron Fisher for Jansen. Are you enough of an FDA lawyer to answer the question I posed to your friend? I am not enough of an FDA lawyer to know whether. The question is if it's possible for Myelin to sell its product without the specific label language. What I know, and I agree with my friend, that there's no evidence in the record that they tried. There is, as Your Honors know, a provision of the Hatch-Waxman Act, Section 7, that allows a generic applicant to attempt to carve out a portion of a label to avoid a patent. And what the record shows is that was not attempted here. But could they still do it? That is beyond my knowledge of FDA procedure. Okay. Let's turn to the infringement question, and let's assume for the moment that the district court can rely on this infringement testimony by Dr. Culler, and that the Berger testimony is not sufficient. So that leaves you with the Somney testimony, and I'm not sure that's sufficient. Could you please address that for us? Yes, I'll address Somney, but I also want to come back to Berger because there was another passage that wasn't addressed. You can do that. Let's start with Somney. With Somney, appendix 1955, Somney testifies that he has provided guidance, and this is in the context early in his testimony, and we have it in the appendix. Dr. Somney testified at length about his credentials, and he is a board-certified psychiatric pharmacologist who focuses on antipsychotic medication, teaches medical residents, nurses, medical students how to do it. I understand that. This is a complex protocol with a group of patients who are, by definition, noncompliant in the first place, and so it may be that you have to show that patients actually complied with this protocol and showed up, and I'm not sure that Dr. Somney is really saying that on 1955. What he says is that, in his experience, providing guidance to health care practitioners on what to do when patients have missed a dose of invaded atrenza, we start with the label, we follow it. And the label as a specific... Well, the practitioners may follow it. The question is whether the patients are compliant enough so that the protocol gets followed. Well, he said his testimony was it was followed, and his testimony immediately after that is that I think most health care practitioners, at least that I work with, would start here and would end up following for most patients. And then, just sticking with Dr. Somney for a moment, as we know from Vanda, there is no requirement that there be a past example. There needs to be evidence that it would happen. And he did testify unequivocally that it would happen. And where are we in her opinion? Was she relied on that? I know she's talking about Dr. Kohler at 35. Right. She does not cite those portions of Dr. Somney's transcript, which is why I wanted to go to a different portion of Dr. Berger that she did cite that was not addressed previously. And that is not 2160, but it's 2166-67. Starting on 2166 at line 16. The question was, Dr. Berger, some health care providers do follow label instructions for patients who have missed a dose of PP3M by 49 months, right? Answer, I'm sure they try. And you're sure they do, right? No. Well, when you say they try, they administer the doses called for by the claim, correct? I'm sure there are instances in which they try, but if the patient doesn't show up, the regimen cannot be implemented. Over to the next page. Sometimes the patients will show up, right? Sometimes the patients show up, yes. And that specific testimony, over to this next page, was cited by the district court at Appendix 36. And I would submit... No, except can we keep going on that? Sometimes the patients will show up, right? Sometimes patients show up, yes. And sometimes the patient will be in a facility where they don't have to show up because they're already there, right? Answer, that sometimes happens, yes. But even in that case, the patient may still refuse it. Right. So that question went to the fact, Dr. Berger's testimony was if they don't show up, they won't get the regimen. Sometimes they're in a hospital, so they don't need to show up, and he acknowledged that. But in that situation, they may still refuse it. But what that goes to is that it's not going to happen all the time. Nothing in Dr. Berger's testimony establishes that it will never happen. What he says was... Well, the burden's on you, not on my family. Well, Dr. Berger testified that the situation is common, that in his own experience, his residents try to follow the label, and that if you can't do it, if the patient doesn't show up, you can't do it, and sometimes the patient shows up. And the district court found, as fact, that that is not credible in light of that, that it would never happen. Because, again, any amount of infringement counts as infringement. Did the records close, and then Dr. Kohler's testimony is introduced, right? The record was not closed. It was a bench trial, so there was no closure of the record.  But his testimony was introduced for secondary consideration, right? Yes. Dr. Kohler was testified on secondary consideration. And it was introduced by way of deposition? Is that how it was introduced? No, he testified live at trial. Okay. And to be clear about Dr. Kohler's testimony, he was testifying that the main issue for secondary considerations was whether there was a nexus between the claims and the benefits of the product. What I wanted to get at is, did an appellant's lawyer get the opportunity to cross-examine him? I'm sure there was questioning about secondary considerations, but did he get to cross-examine him on the issue that's in front of us, which is induced infringement? They did get the opportunity to cross-examine him, and, in fact, they elicited the testimony that he follows the label. That's at Appendix 3067. Well, wait a minute. Wasn't there even a dust-up there, and I think this is in the district court's opinion where she concedes, that they tried to cross-examine him on infringement, and you all objected to that? They tried to. We objected to different issues of infringement. Nobody ever objected to his testimony about whether he practiced this patent. But he was admitted for a limited purpose, right? He was a secondary considerations expert. He never disclosed an infringement opinion, but he did disclose the opinion that he had practiced this claim. That was disclosed in his expert report. He was deposed on it. There was even an eliminating motion about it that was dropped. So the fact that Dr. Kohler was going to show up and testify that he had used this claim was well known to everyone. Where does he say that in his expert report? His expert report is not in the appendix, but it was at page 73 of his expert report. We can provide that to you. But, again, he was deposed on that. That's in the record before the district court, right? It's in the record before the district court. And not only did he testify that he had used it, he testified that three of his colleagues had used it, and then there was an eliminate dispute about whether those colleagues were going to be deposed or not, and there was an agreement that we just wouldn't talk about the colleagues. We'd only talk about Dr. Kohler's experience. So there was no... It was at that point after the expert report that there was an agreement that he'd only testify about secondary considerations? There was never such an agreement. He was only disclosed for secondary considerations. We did not present him as an infringement expert. And even today... Well, tell me if I'm wrong. This is what I gleaned from the record and the briefs. They cite in blue 44, numerous examples where you objected to questions on cross-examination with regard to infringement. And there appeared to be infringement in cross-examination, not what Dr. Kohler testified about. I maintain my objection. It goes to infringement. It's irrelevant to the point the issues Dr. Kohler testified to on direct. And, indeed, at one point you told the district court, so both parties have objected to using testimony elicited in the secondary considerations contest for purposes of infringement. I think it's pretty clear. Yes, it's clear that we objected to certain questions that went to infringement, not including the question of whether Dr. Kohler used this method because that went to secondary considerations. And nobody disagreed. But they were objecting to that, right? They did not object to that particular testimony. I mean, there was a whole objection to the line of questioning, right? Well, he was asked to respond directly to Berger on certain issues, and they objected to that. But on the basic question of did Dr. Kohler practice this claim, that was unobjectionable. On appeal, they're not arguing that that was an objectionable testimony, that it was not properly disclosed or that it was inadmissible. Their argument is because it was admitted for secondary considerations, the district court can't look to it on the question of whether or not this claim has ever been practiced. But the district court can look to any evidence in the record on a fact issue that's raised. But, again, we – Well, not if the testimony is admitted only for a limited purpose. Well, the testimony – it was not admitted only for a limited purpose. Like any expert, he disclosed certain opinions. We did not argue that he was an infringement expert, and we still don't argue he was an infringement expert. But he was an expert who gave admissible testimony that is in the record that if a fact issue is placed at issue, can be looked at. There's no requirement that a fact issue cannot be looked at because it was admitted for a different purpose. But I would go back to emphasize that there is more than enough evidence in this record of direct infringement without Dr. Corr's testimony because, essentially, Milan's argument is the district court was required to credit Dr. Berger, who said that this would never happen, even though he actually said it might happen sometimes. He was impeached from his cross-examination – his deposition testimony. His deposition testimony was that his residents had just used it. He didn't say anything about them failing. Are we talking about Berger? Yes. Berger, yes. Okay, go ahead. Yes. So he didn't say anything in his deposition about his residents failing. At some point between his deposition and trial, he recalled that they had failed, and he clarified that at trial. And the district court was not required to credit Dr. Berger's testimony. Did she discredit him on that point? She did. She did. Where did she do that? At Appendix 36. She said, this court simply cannot credit Dr. Berger's testimony that not a single HCP would use the claimed re-initiation dosing regimen. And that's immediately after quoting or citing the testimony that I referred to earlier where he said, sometimes patients do come back. So this is a fact-finding by the district court based on credibility determinations and the record, and it's extremely commonsensical because Dr. Berger was suggesting, or Mylan was suggesting, that everybody who ever tried to use this method would fail. That was not credible. As Dr. Berger said, sometimes they would succeed. Perhaps they would fail sometimes, but sometimes they would succeed. She did not rely on Dr. Somi's testimony? Well, she didn't cite Dr. Somi for this point. She did credit Dr. Somi's testimony in general on induced infringement. She did not cite the specific passages on direct infringement. And the reason for that is that Mylan was making an issue of this, and so she was responding to Mylan's argument. Can I just ask you, on page 36, the last sentence of the second full paragraph, what does she mean by that? In other words, a patient's inevitable return between four and nine months after misdose, it is inevitable that an HCP would at least attempt the claim reinitiation regime. Is an attempt sufficient? No, an attempt is not sufficient. Doesn't it sound like she thinks it may be? Well, I would read that in the context of the testimony that she just cited, where Berger conceded that an attempt will sometimes succeed. Well, it depends how you read the testimony. And, again, that's also an even if. The first sentence of that paragraph is, I simply cannot credit Dr. Berger's testimony that are not— The burden is on you, right? Well, the burden is on us, but we can rely on Dr. Berger's evidence. And Dr. Berger's evidence was this— But she doesn't rely on Dr. Berger's testimony. She does. Where did she do that? In footnote 14, on appendix 35 of footnote 14. She says, as an initial matter, the court notes that its direct infringement findings do not hinge solely on Kohler's testimony. There's other evidence in the record, including Dr. Berger's testimony of inevitable infringement. So she affirmatively relies on testimony, and that's appropriate because Dr. Berger testified that it's a common occurrence that patients return within this window, that in his own experience his residents have tried to do it, and that sometimes that will work. So that testimony is very clear that there will sometimes be infringement. Maybe sometimes it won't work, but sometimes it will. And for infringement, we don't have to show that it works 100% of the time. It's a district court note. By the way, speaking of that, I asked your friend about the use of inevitability. Is that just a standard we use in Hatch-Waxman because it's not the preponderance? Well, I think in Hatch—because in Hatch-Waxman, we don't have to show an actual act of infringement. We have to show that there will be a future act of infringement. So inevitability is the standard. The case law talks about inevitability. I don't think whether it's preponderant— I think we have to show by preponderance of the evidence that there will be infringement. Okay. Hypothetically, if somehow we were to think that this was relevant and important, what would we do with that? What would we do with the finding of the lack of sufficiency of the finding of infringement? Is it a reversal or a remand? Well, if you were to find that her credibility determination as to Dr. Berger was not supported, I suppose it would be a remand. Because she certainly had—I mean, I guess it would depend on how you— what your basis was for it, but I don't see— Okay. Before your time runs out, can I just ask you to address two points that your friend made? One, starting with the HCNP case and why that's not compelling or controlling. And the other is to just respond to the points he made about obviousness at the end. So HCNP, the holding of HCNP was—and this is at page 702— the instructions in Octavius' label only require the first step of the method, nothing else. So only the first step was induced. The other steps were not required. In our label, all steps are required. It says, use the reinitiation regimen in Table 2. And Table 2 includes the entire dosing regimen. So here, all steps are required in the clinical situation that's presented by the claim. With respect to obviousness, I think the most important point is that a fair reading of the district court's opinion makes it clear that there is no narrow reading of prior art references. To the contrary, the heart of her analysis is to look in great detail at Milan's evidence about what a person of skill in the art would have done with the prior art and how they would have attempted to extrapolate it. And she spent 12 pages of her analysis, from 45 to 57, going into great detail about Dr. Forrest's opinions and why they were hindsight-driven and not credible. But she did not narrowly read the documents, the prior art references. Her finding was entirely based on her assessment of Milan's presentation of how a person of ordinary skill in the art would have allegedly found this obvious. And she considered it carefully and rejected it. So that analysis is not, in any sense, a narrow reading of the prior art references. The actual language of prior art references doesn't figure very prominently in that analysis. It's all about what Dr. Forrest said. I'm well over my time, Your Honors. Can I ask one more question? Okay. Just on the obviousness thing, as I understood and outlined it, they make two arguments. One, the general PP1 versus PP2 dosing regimen, and the other is a little more complicated. It's four to nine months. My understanding is if we agree with one of those, for example, the first, the second doesn't matter. That agreeing to the first ground would be sufficient to sustain the non-obviousness. Is that right? Yes. Yes, because they have to show the claim as a whole obvious. So if any portion of it is not obvious, then they haven't met their burden. Okay. Thank you. Thank you. Thank you. Mr. Werleher, you have two minutes. Thank you. I want to come right to Dr. Kohler. As my friend conceded, he was not offered as an infringement expert. He did not issue an expert report on this point, and we all agree that his testimony was going to be limited to secondary considerations of obviousness. We tailored our cross-examination based upon that agreement. The questions we did not ask based upon that concession, based upon that agreement, are just as important as the ones we did ask and were stopped from proceeding due to Janssen's objections, which I'll point out. So if you knock him out, all you have left is Dr. Berger and Dr. Sohn. I'm going to start with Dr. Berger. He only testified that people might try the method. You seem to say that sometimes they succeeded. It's a little unclear. No, I don't think so, Your Honor. He did say that there is no point where he said that any of his residents had ever succeeded in bringing it to completion, and even the district court recognized that on page 35 of his decision, which is why the district court had to hold that an attempt was enough for infringement. And as my friend conceded, as a matter of law, attempting infringement is not the same thing as infringing. I'm going to use my remaining time to quickly come back to obviousness. I disagree with my friend's characterization of how the district court treated the prior art, and I specifically want to point to page 45, where the court was addressing Dr. Forrest's use of the PP1M art. She rejected it because, quote, none reference PP3M. Rather, the thrust of the testimony is that PP1M art could be extrapolated to determine the asserted claims PP3M initiating dosing regimen. She rejected that proposition and discounted all of the PP1M art because of that. That is error. That is what this court rejected in Jansen v. Teva, and it also rejected the basic proposition previously in Valiant v. Milan, where you said you could look at substantially similar compounds in order to, under the KSR analysis. If there are no further questions. Thank you. Thank you.